FILED

2004 AUG 23 P 4: 41

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KATI BUNGERT, PPA ET AL<br>Plaintiff | : | CIVIL ACTION<br>NO. 302CV1291 (RNC) |
| v. | : | |
| CITY OF SHELTON, ET AL<br>Defendants | : | |
| | : | AUGUST 23, 2004 |

## OBJECTION TO MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

The Plaintiff brought this federal lawsuit pursuant to 42 U.S.C. Sec. 1983 on the basis that the Defendant School System and certain of its high ranking employees violated her constitutional rights by failing to protect her from sexually and physically abusive conduct by a group of students. The Defendants then made matters worse by repeatedly insisting that the Plaintiff return to Shelton High School even after they were informed that the Plaintiff was suffering from post traumatic stress disorder as a result of the sexual and physical attacks while at the school. The Defendants have moved for summary judgment on Counts One, Two and Ten of the Plaintiff's Complaint on the basis that Section 1983 does not provide a remedy for violations of constitutional rights when the alleged violation was committed by third

parties and in support of its claim cites cases from circuits other than the Second Circuit, which they concede has not yet ruled on this issue. This issue was addressed by the Supreme Court in the case of <u>DeShaney v. Winnebago County Dep't. of Social Services,</u> 489 U.S. 189 (1989), in which it held that generally the State is not responsible to protect citizens from private violence except under "certain limited circumstances." <u>Id.</u> at 198. The two exceptions enunciated by the Supreme Court are where there is a "special relationship" between the governmental agency and the alleged victim, or where the "state actor directed or aided and abetted the violation." <u>Dwares v. City of New York,</u> 985 F.2d 94, 98 (2d Cir. 1993).

In the case before the Court, we claim that the Shelton School System had a special relationship with its students, including the minor Plaintiff, and that the individually-named, high ranking officials aided and abetted in the violation of her constitutional rights according to the cases decided in this circuit and under the unique facts of this case. Contrary to the cases from other circuits cited by the Defendants, the Second Circuit has taken a different view of what constitutes a special relationship, as well as what constitutes a state created danger of aiding and abetting under <u>DeShaney.</u>

The Plaintiff in this case was forced by the failures of the Defendants to leave Shelton High School in order to be able to obtain an education, to which she has a right under the State Constitution. (Conn. Const. Art. VIII, § 1, and Art. I, §§ 1 and 20.) However, because of the

refusal by the Defendants to assist the Plaintiff and their insistence that she return to Shelton High School, the Plaintiff's mother was forced to send her to a private school. By this conduct, the Defendants aided and abetted in the constitutional violation of the Plaintiff's rights once they learned of the violent sexual and physical harassment against her by several students in continuing to ignore her requests to seek alternate education, despite a written request by her psychologist to do so. Thus, the situation presented in this case differs from the circumstances in the cases cited by the Defendants from other circuits, as do the rulings in the Second Circuit in the wake of DeShaney.

## II.    FACTS

In September 2000, the Plaintiff was a student attending the ninth grade at Shelton High School in the City of Shelton. The Plaintiff claims that during that time, students subjected her to physical and sexual abuse during school hours. (Bungert dep. pp.17-19, 24, 27, 70.) The Plaintiff testified that on repeated occasions she was intimidated, teased, sexually harassed by both female and male students and sexually assaulted and physically assaulted by male students. (Bungert dep. pp.17-19, 24, 27, 70.) The Plaintiff testified that much of the abuse was targeted at her physical appearance, specifically, the size of her breasts. (Bungert dep. pp. 23, 24, 27.) The Plaintiff also claims that the Defendants were aware of the incidents of abuse and even witnessed them. Many of the abusive incidents, for example, occurred during the

Plaintiff's history class and were observed by her teacher, Mr. Decho, who failed to report the incidents to his supervisors or discipline the students. (Bungert dep. p. 26.) The instances of abuse took place throughout the school premises, including the corridors, lavatories and classrooms, and were observed by other teachers. (Bungert dep. pp 27, 30.)

In January 2001, the Plaintiff was sexual assaulted by Kurt Soltis who deliberately touched the Plaintiff's breast while in the presence of other male students. (Bungert dep. p. 38.)   In March 2001, a group of six male students surrounded the Plaintiff at the school's bus stop and threatened to harm her. Although three school principals were in the vicinity of the bus stop, they failed to take any action to protect the Plaintiff or to stop the harassment. (Bungert dep. pp. 48-50.)

In March 2001, Michael Castelot also physically assaulted the Plaintiff in the hallway where he intentionally turned his body with extreme force striking the Plaintiff's shoulder and ribs. (Bungert dep. pp. 55-57.) The incident was reported to and confirmed by Defendant Gura, who took no action to have the Plaintiff evaluated for injury and failed to notify her parents of the incident. (Bungert dep. pp.62, 72.) The Plaintiff's mother brought her to the Emergency Room of Griffin Hospital where the Plaintiff was diagnosed with contusions to her spine and a concussion. (Bungert dep. p. 63.) To the Plaintiff's knowledge, Castelot was never disciplined for the incident. (Bungert dep. pp. 67-68.)

Following a meeting with school officials on March 13, 2001, at which meeting the Plaintiff and her mother reported the assault incident from the day before to Defendant Gura, the Plaintiff was unable to return to Shelton High School as a result of these incidents of harassment and sexual assault. (Bungert dep. p. 84; Rosmarin dep. pp. 38, 43.) The Plaintiff sought psychological treatment from Dr. Martin Rosmarin on April 11, 2001 as a result of the attacks against her. She was diagnosed as suffering post traumatic stress disorder as a result of the attacks, and it was Dr. Rosmarin's opinion that she should not return to Shelton High School. (Rosmarin dep. pp. 38, 43.) Dr. Rosmarin wrote to Mr. Gura of Shelton High School on April 12, 2001, informing him of the disorder Katie suffered and recommended that she be allowed homebound tutoring. (See 4/12/01 letter attached hereto.) The Defendants did not reply to Dr. Rosmarin's letter and did not agree to provide homebound tutoring until April 23, 2001. (Rosmarin dep. p. 34.)

In July, 2001, Plaintiff, her mother and stepfather met with Defendant Gura to discuss the upcoming school year, and to inform him that Katie would not be returning to Shelton High in September. (Bungert dep. p.54.) Mr. Gura insisted that Katie come back to Shelton High, which caused her to cry hysterically. (Bungert dep. p. 54-55.) The Plaintiff returned to see Dr. Rosmarin following this meeting, and he this time wrote to Superintendent Leon Sylvester.

In her substantive due process claim, the Plaintiff alleges that the Defendants failed properly to supervise and protect the Plaintiff to insure that she would not be continuously subjected to abusive conduct. (See id. at ¶ 43, Count I.) The Plaintiff alleges that the Defendants failed to supervise and protect the Plaintiff despite having a duty to do so and despite their knowledge that she was being subjected to the repeated harm. (See id. ¶¶ 43-45.)

The Plaintiff also set forth a supervisory liability claim against the City of Shelton, Shelton Board of Education and Leon J. Sylvester (Supervisors) based on their failure to properly train and supervise the Defendants on the policies and procedures relating to complaints of abuse to students. (See id. at ¶ 42, Count II.)

In addition to her federal claims, the Plaintiff has asserted various state law claims: fraudulent misrepresentation, negligent misrepresentation, negligence and respondeat superior as to Defendants City of Shelton and Shelton Board of Education (Counts II, IV, V and VIII, respectively); Negligence against Defendants Sylvester, Ramia, Gura and Does 1-10 (Count VI); and negligent and intentional infliction or emotional distress as to all of the Defendants (Counts IX and X).

**LEGAL STANDARD**

A motion for summary judgment may be granted if the court determines that there are no genuine issues of material fact to be tried and that the moving party is entitled to judgment as a

matter of law. See Fed. R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a Rule 56 motion, the court's responsibility is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences against the moving party. See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986) (citing Anderson, 477 U.S. at 248, 106 S. Ct. 2505; Eastway Constr. Corp. v. City of N.Y., 762 F.2d 243, 249 (2d Cir.1985)). The substantive law governing a particular case identifies the facts that are material. See Anderson, 477 U.S. at 258, 106 S. Ct. 2505. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.1992) (quoting Anderson, 477 U.S. at 248).

### III. ARGUMENT

#### A. The Plaintiff Has Raised a Question of Fact Regarding a "Special Relationship" Between Her and the Defendants.

The facts presented herein would support a finding that the Defendants are liable in their individual and official capacities for the injuries suffered by the Plaintiff under the "special relationship" exception. The Court in DeShaney stated that a special relationship exists when the State takes a person into its custody. See id. at 199-200. The Court explained the rationale for this principle as follows:

> [W]hen the State, by the affirmative exercise of its power, *so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g.,* food, clothing, shelter, medical care, and *reasonable safety* -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

Id. at 200 (Emphasis added). The Court explained that an affirmative duty arises from the limitation it imposes on a person's freedom to act on his own behalf. See id. The Court further stated that the placement of a child in a foster home, for example, would present a situation analogous to incarceration or institutionalization. See id. at 201 n.9.

The Second Circuit has applied the principles of DeShaney in a broad fashion before and after its landmark holding. The Second Circuit has accordingly held that such a duty exists in the foster home situation. See Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134,

145 (2d Cir. 1981) ("When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution.").

Thus, while the Second Circuit has not addressed this issue directly following DeShaney, its interpretation of what constitutes a duty on the part of governmental custodians is consistent with its willingness to expand § 1983 protection to situations like the present case. (See also the discussion in Section B on the case of Dwares v. City of New York, 985 F.2d 94 (2nd Cir. 1993).[1] Several decisions by District Courts in this circuit have held in post DeShaney cases similar to the instant case that there exists a special relationship between students and school districts.

In an analogous case to this one, Pagano v. Massapequa Pub. Sch., the Federal District Court of New York denied the defendants' motion to dismiss and held that the plaintiff stated a legally sufficient 1983 claim where the plaintiff alleged that the defendant public school failed to take preventative action to protect a student from repeated instances of attacks and abuse from students. 714 F. Supp. 641 (E.D.N.Y. 1989). The plaintiff alleged that he was the target

---

[1] The Second Circuit has on other cases interpreting the applicability of § 1983 criticized the Supreme Court's narrow interpretation in view of the history of this post Civil War statute. In Ciraolo v. City of New York, 216 F.3d 236, 238 (2000), Justice Calabrisi, who wrote both the majority opinion and a separate concurring opinion criticizing the supreme court's narrow interpretation of Sec. 1983.

of repetitive physical and verbal abuse, which resulted in physical and mental injury, and that the defendants stated they would prevent such abuse, but failed to do so.

The court stated that the facts were "closer to those of Doe than DeShaney in that the victim and the perpetrator(s) were under the care of the school in its *parens patriae* capacity at the time [the] alleged incidents occurred." Id. at 643. The court further stated that the plaintiff alleged more than a single act of negligence on the part of the defendants, but several separate incidents that may be considered to rise to the level of deliberative indifference to an affirmative duty. See id. (citing Doe, 649 F. 2d at 142.). See also Lichtler v. County of Orange, 813 F. Supp. 1054, 1056 (S.D.N.Y. 1993) ("A state imposing compulsory attendance upon school children must take reasonable steps to protect those required to attend from foreseeable risks of personal injury or death.")

The cases cited by the Defendants in support of their motion, i.e., Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729 (8th Cir. 1993) and D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364 (3d Cir. 1992), turn on the court's findings that state-mandated attendance as well as *in loco parentis* did not entail so restrictive a custodial relationship as to impose upon the state the same duty to protect it owes to prison inmates ... or to the involuntarily institutionalized ..." Dorothy J., Id. at 732. We think that is too narrow an

interpretation in DeShaney's definition of a special relationship in view of the Second Circuit's view on the applicability of § 1983 as reflected by the District Court decisions in this circuit.

The cases cited by Defendants stress that institutionalized persons are dependent upon the state for "food, clothing and safety." (D.R. v. Middle Bucks Area Vocational Technical Sch. (supra) but that students are not. However, that rationale ignores the reality of the school environment today, particularly here in Connecticut. Parents are certainly not responsible for the "safety" of their children, at least during school hours. While the Dorothy J. court was correct in stating that "[p]ublic school attendance does not render a child's guardians unable to care for the child's basic needs," Id. at 732, a guardian cannot be expected to provide safety for his or her child during the school day.

And, contrary to the reasoning behind the Third Circuit's decision in the D.R. case that "parents have a choice between education "in the home, in the public or private schools ...," most parents in Connecticut send their children to public schools, as here,[2] do not have a viable choice. If these parents "chose" to have their children educated, then public schools are their only true choice. That choice is even further narrowed here in Connecticut in view of the constitutionally inadequate education provided by many of our schools.

---

[2] Bungert testified to having lost a job and having her car repossessed as a result of making the "choice" to send her daughter to a private school as a result of the problems at Shelton High School.

Moreover, in this case, the Defendants, after learning of the Plaintiff's plight, took it upon themselves to decide what was best for her, i.e., they undertook affirmative steps to convince her to remain at Shelton High School rather than to take into account her requests and those of her psychologist.

### B. The Defendants Aided or Abetted in the Violation of the Plaintiff's Constitutional Rights.

The Second Circuit has held that a municipality may be liable for the physical abuses of private actors in violation of the Plaintiff's liberty or property rights if the municipality aided or abetted in the conduct. Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). The court reasoned that cases where a municipality "assisted in creating or increasing the danger to the victim would implicate [Due Process clause] rights." Id. at 99.

Under this exception, the Defendants would be liable for harm inflicted to an individual by third parties if it did something to render the victims more vulnerable to third parties. See DeShaney, 489 U.S. at 201. The Second Circuit has applied this exception to hold that there may be constitutional liability under § 1983 where the state creates a dangerous situation or renders citizens more vulnerable to danger. See Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993) (stating that "an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate the plaintiff's constitutional

rights."). Stated another way, "if the state puts a man in a position of danger from private persons and then fails to protect him, . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v. De Vito, 686 F.2d 616, 618 (7th Cir. 1982). In this case, the Plaintiff has alleged actions by the Defendants, which created an environment where abusive student conduct was condoned and permitted to occur.

In Dwares, the Plaintiff alleged that the defendant police officers conspired with the skinheads to permit them to beat up flag burners. It was further alleged that the police assured the skinheads that unless they got totally out of control, they would not be arrested or prevented from continuing their activities. The court reasoned, "such prior assurances would have increased the likelihood that the skinheads would assault demonstrators." The court reasoned that the plaintiff had effectively alleged that the defendant police officers aided and abetted in the deprivation of the plaintiff's constitutional rights by permitting him to be subjected to prolonged assault in their presence.

Here, the Plaintiff has clearly alleged that the assaults took place in the presence and with the tacit approval of school officials. The Plaintiff alleges that many of these incidents occurred during the Plaintiff's history class and were observed by her teacher, Mr. Decho. (See Compl. ¶ 14.) The Complaint further states that many other instances of abuse were conducted in the presence of teachers throughout the school's premises. (See id. at 29.) As a result of the

increasing frequency and physical nature of the abuse, a strong inference can be drawn from these allegations about both the Defendants' presence and inaction in that they effectively provided an environment in which their students received prior assurances that school officials would tolerate abusive behavior. According to Dr. Rosmarin, this constituted a "toxic environment." A fact-finder could conclude that the Defendants' failure to act under these circumstances amount to condoning the students' abuse of the Plaintiff so that it was likely to increase in frequency and severity, as it did. The Defendants used their authority to "create an opportunity that would not otherwise have existed for the third party's crime to occur." See Middle Bucks Area Vocational Tech. Sch., 972 F.2d at 1374-1375 (liability "predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger . . . The state can fairly be said to have affirmatively acted to create the danger to the victims").

      This is precisely the type of conduct in creating such a dangerous environment for children to which the "state-created" exception was meant to apply. See, eg., Johnson v. Dallas Indep. Sch. Dist., 38 F.3d at 202 (rejecting liability under State-created danger doctrine because "no state actor placed [the student] in a unique, confrontational encounter' with a violent criminal . . . . No official in the performance of her duties abandoned him in a crack house or released a known criminal in front of his locker. . . . The facts pleaded here suggest only that [the student] was the tragic victim of random criminal conduct rather than of school officials

deliberate, callous decisions to interpose him in the midst of a criminally dangerous environment").

In this case, the Plaintiff was not some random victim, but rather she was deliberately left abandoned by the Defendants to certain and known dangers in the abusive environment they created. The Defendants by creating the abusive environment in which school bullies felt comfortable attacking their prey were as much as fault for the abuse suffered by Plaintiff as if they carried it out themselves.

In addition to the Defendants' conduct in allowing a "toxic environment" to exist at Shelton High School, they did nothing to assist the Plaintiff once they were made aware of the attacks. Despite receiving a letter from Dr. Rosmarin in April, 2001, with a follow-up in August of that same year in which he advised the Defendants that Katie needed to be out of that environment, the Defendants continued to insist that she return to school. After delaying to provide Katie with the recommended homebound tutoring, the Defendants cancelled her tutoring and requested that she return to school in January, 2002. To make matter worse, the school harassed the Plaintiff and her mother by calling their home repeatedly during the Fall of 2001 to demand that she return to school. This conduct demonstrates a continued and deliberate indifference to the rights of the Plaintiff to be free from an environment in which she suffered continued harassed and physical assaults. Such indifference can only encourage the

"school bullies" who attacked the Plaintiff to continue their behavior.

## V.   CONCLUSION

For all the foregoing reasons, the Plaintiff respectfully requests that the Defendants' Motion for Summary Judgment be denied.

PLAINTIFF

By _____

Joseph A. Moniz (ct04316)
Moniz, Cooper & McCann, LLP
100 Allyn Street
Hartford, CT 06103
Tel. (860) 278-0200
Her Attorneys

### **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed, postage prepaid, this date to:

Melissa Geetter Melnick, Esq.
Patty G. Swan, Esq.
Gordon, Muir & Foley, LLP
Ten Columbus Boulevard
Hartford, CT 06106-1976
(860) 525-5361

_____
Joseph A. Moniz





April 12, 2001

Mr. Howard Gura
Headmaster
Shelton High School
120 Meadow Street
Shelton, Connecticut 06484

      Re:   Kati Bungert (6-6-86)

Dear Mr. Gura:

I have met with Kati and her mother, Joann Brown, today for an initial diagnostic interview. Based on their presentation, as well as a brief screening assessment, it is my view that Kati is suffering from Post Traumatic Stress Disorder. It would be in this students best mental health interests if she was provided with homebound tutoring for the remainder of the school year. Her disorder prevents her from attending and participating at school in a normal manner and so would interfere with her ability to learn.

Thank you for your assistance.

Sincerely,


Martin S. Rosmarin, Ph.D.
Licensed Clinical Psychologist
Nationally Certified School Psychologist
aer

August 20, 2001


Dr. Leon Silvester
Superintendent   Shelton Public Schools
Shelton High School
412 Meadow Street
Shelton, Connecticut 06484

Re: Kati Bungert (6-6-86)

Dear Dr. Silvester:

Last April 12th I wrote to Mr. Gura (copy of letter enclosed) to request homebound tutoring for Kati. Currently, having resumed psychotherapy with her I am again requesting an educational change for this young girl.

I strongly urge you to support a transfer for Kati out of the Shelton School District. I am again seeing the emergence of symptoms associated with the traumatic events of last school year as the beginning of the new school year approaches. Kati's apprehensions regarding her possible forced return to Shelton High School is definitely not in her best interests. The consequences for both Kati and the school system to such an imposed solution would be high risk.

Kati needs a normal, supportive, non-threatening school environment in order to facilitate both her academic achievement and her emotional safety. This cannot occur at Shelton High School and probably not within the town of Shelton.

Yours truly,



Martin S. Rosmarin, Ph.D.
Licensed Clinical Psychologist
Nationally Certified School Psychologist
/ae

Enclosure

May 15, 2001

Mr. Howard Gura
Headmaster
Shelton High School
120 Meadow Street
Shelton, Connecticut 06484

Dear Mr. Gura:

Katie Bungert is not in psychotherapy with me at this time.

Sincerely,


Martin S. Rosmarin, Ph.D.
Licensed Clinical Psychologist
Nationally Certified School Psychologist
/aer