**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF CONNECTICUT AT HARTFORD**

| | | |
|---|---|---|
| KATI BUNGERT, PPA ET AL | : | CIVIL ACTION NO. 302CV1291 (RNC) |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| CITY OF SHELTON, ET AL | : | |
| Defendants | : | SEPTEMBER 20, 2004 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**I.    FACTS**

In September of 2000, the Plaintiff was a Ninth Grade student at Shelton High School. (Compl. ¶ 10).  She avers that during the fall of 2000, other students at Shelton High School, specifically a male student named Kurt Soltis and three unnamed female students, began to intimidate, tease and verbally harass the Plaintiff. (Compl. ¶¶ 11-12; Bungert Depo pp 23, 27). Much of this conduct took place in the Plaintiff's history class. (Compl. ¶ 13; Bungert Depo pp 23, 27).  The Plaintiff testified that she met with Howard Gura, Housemaster of House 3 at Shelton High School to inform him that she was being harassed. (Compl. ¶ 16; Bungert Depo p 29; Gura Affidavit).  The Plaintiff acknowledges that Mr. Gura spoke to the female students and told them to refrain from harassing the Plaintiff. (Compl. ¶ 17; Bungert Depo p 30 ).  The Plaintiff alleges that the harassment from the three girls and Mr. Soltis continued. (Compl. ¶¶ 18, 19; Bungert Depo pp

30-31). However, the Plaintiff does not allege nor has she presented any evidence that this continued harassment was brought to the attention of the named Defendants.[1] (Gura Affidavit).

The Plaintiff then alleges that in January 2001, she was physically touched on her breasts by Kurt Soltis outside during a fire alarm. (Bungert Depo p 38). Kati Bungert's mother met with the Defendants Ramia and Gura as well as another principal, Mr. Piccola. (Murcko Depo pp 19-20). After this meeting Kati Bungert's mother had no other meetings or contact with Defendants Gura or Ramia until after Kati was allegedly assaulted in March 2001. (Murcko Depo p 89).

The Plaintiff then alleges that sometime after January 5, 2001, a group of six male students began to intimidate and harass the Plaintiff in the lavoratories, hallways and classrooms. (Compl. ¶ 20, Bungert Depo p 41). The Plaintiff does not allege, nor has she presented any evidence that any of the named Defendants witnessed or were aware of this conduct. The Plaintiff further claims that on March 9, 2001, the six male students surrounded the Plaintiff and a male friend at the bus stop and threatened them with harm. (Compl. ¶ 22; Bungert Depo pp 47-48). While the Plaintiff alleged that three High School Principals were in the vicinity of the bus stop when she was threatened, (Compl. ¶ 23), the Plaintiff was not able to produce any evidence to show that any of the Principals, specifically, the named Defendants, were aware that these threats had been made. (Bungert Depo pp 49-50). The Defendants were not aware of this incident. (Gura Affidavit, Ramia

---

[1] The Plaintiff testified that she never met Mr. Ramia or Mr. Sylvester. (Bungert Depo pp 99-100). As to Mr. Gura, the Plaintiff testified that she never went back to him to complain until after the fire alarm incident in January 2001. (Bungert Depo p 31).

Affidavit) and it was not reported to the school until after the Plaintiff was allegedly assaulted on March 12, 2001 (Murcko Depo pp 28-29).

Next, the Plaintiff alleges that on March 12, 2001, another student, intentionally struck the plaintiff with his body in the hallway during class, knocking her to the ground, and called her a "stupid bitch". (Compl. ¶ 25; Bungert Depo p 56).  Defendant Gura subsequently became aware of the incident and Michael Castelot was later identified as the student offender. (Compl. ¶¶ 26, 28).  An investigation into the incident was conducted, including speaking with Mr. Castelot and several other students, as well as various school employees. (Gura Affidavit).  Mr. Castelot denied any involvement, and his teacher confirmed that Mr. Castelot had been in the classroom at the time the incident allegedly occurred. (Gura Affidavit).  As such, no disciplinary action could be taken. (Gura Affidavit).

The Plaintiff did not return to school after that incident, due to fear of further harassment. (Compl. ¶ 30; Bungert Depo p 68).  Defendant Gura offered many alternatives to the Plaintiff to accommodate her situation, including offering that she could arrive late and leave early, offering to provide her with an escort in the hallways, providing a home tutor, and offering alternative school placements. (Gura Affidavit; Bungert Depo pp 82, 98).  The Plaintiff opted to receive home tutoring, which lasted through the end of that academic year, (Compl. ¶ 33; Gura Affidavit), and again October through December of the following year. (Compl. ¶¶ 36-37; Gura Affidavit).  In

February of 2002, the Plaintiff enrolled in Sacred Heart Academy, a private high school. (Compl. ¶ 39; Bungert Depo pp 14-15).

## II.    STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted where the moving party sustains its burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552 (1986).  The "mere existence of factual issues - where those issues are not material to the claims before the court - will not suffice to defeat a motion for summary judgment."  Quarles v. General Motors Corporation (Motor Holding Division), 758 F.2d 839, 840 (2nd Cir. 1985).  Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986) (emphasis in original).   When the underlying events in a case are not in genuine dispute but their characterization and application of a legal test are disputed, the contested issue may still be one for the court vis-à-vis summary judgment procedures.   Newell Companies, Inc. v. Kenney Manufacturing Company, 864  F.2d  757, 763 (Fed. Cir. 1988), *cert denied,* 493 U.S. 814, 110 S.Ct. 62 (1989).   In considering the propriety of the granting of summary judgment, the U.S.

Supreme Court has stated:  "Summary judgment procedure is properly regarded …as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. at 327, 106 S.Ct. at 2555, quoting Fed. R. Civ. P. 1.

## III.    ARGUMENT

### A.    There is no issue of material fact with respect to the Plaintiff's claim that the Defendants Violated the Plaintiff's Constitutional Rights in Violation of Section 1983

1.The Defendants Gura, Ramia and Sylvester did not have a "special relationship" with the Plaintiff that would impose a  duty to protect under Section 1983.

In Count One of the complaint, against Ramia, Gura and Sylvester only, the Plaintiff alleges that the Defendants' failure to protect her from harm from third parties caused her Constitutional harm.[2]  The undisputed facts do not support a claim for such a constitutional violation, as enforced through Section 1983.

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

---

[2] The Plaintiff alleges that Defendants Sylvester, Ramia and Gura, acting under color of law, undertook a duty to supervise, monitor and protect students at Shelton High School so as to insure that students would not be intimidated, teased, sexually harassed and/or assaulted while at school. The Plaintiff further alleges that these Defendants knew or should have known that such improper conduct was being perpetrated on Plaintiff by other students at the school.  The Plaintiff then goes on to allege that the acts and omissions of these Defendants, *including  their failure to take appropriate steps to protect the safety, security and personal welfare of Plaintiff from the intimidation, threats, sexual harassment and assaults and/or  provide adequate attention to the injuries and suffering the Plaintiff sustained while a student* constituted deliberate indifference to the Plaintiff's constitutional rights secured by the United States Constitution, the Connecticut Constitution, and Section 1983 of Title 42 of the United States Code.

> of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other proper proceeding for
> redress….

42 U.S.C. § 1983.  Section 1983 provides a remedy for violations of constitutional rights when the alleged violation was committed by someone acting under color of state law.  Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995).

The first issue in a § 1983 claim is whether the Plaintiff was deprived of any right secured by the constitution. Baker v. McCollan, 443 U.S. 137, 140 (1979).  "Nothing in the Due Process Clause itself requires the State to protect life, liberty and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security."  DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 195 (1989).

In DeShaney, the Department of Social Services had received numerous complaints of child abuse of a minor by his father, yet failed to remove the child from the father's custody. Id.  The father subsequently beat the child, causing permanent brain damage. Id.  The mother and child filed an action under § 1983 against the state officials, claiming that they deprived the minor of his liberty in violation of the Fourteenth Amendment when they "fail[ed] to protect him against a risk of violence at his father's hands of which they knew or should have known." Id. at 193.  The Court held that the State had no constitutional duty to protect the child. Id. at 201.

In so holding, the Court noted that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." <u>Id.</u> at 197.  The Court noted that only in "certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." <u>Id.</u> at 198. Specifically:

> *When the State takes a person into its custody and holds him there against his will*, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being…. The rationale for this principal is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him *unable to care for himself*, and *at the same time fails to provide for his basic human needs*—e.g., food, clothing, shelter, medical care, and reasonable safety, -- it transgresses the substantive limits on state action set by the Eight Amendment and the due Process Clause…. The affirmative duty to protect arises *not from the knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf*…. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means

<u>DeShaney</u>, 489 U.S. at 200 (internal citations omitted)(emphasis added).

Since the <u>DeShaney</u> ruling, a majority of the Circuit Courts have examined whether school children attending school under compulsory school attendance laws have a "special relationship" with the state which would impose a constitutional duty on the part of the school to protect students from harm from private individuals.  In a case very similar to the present, the Eighth Circuit found no constitutional duty. <u>Dorothy J. v. Little Rock Sch. Dist.</u>, 7 F.3d 729,  (8th Cir. 1993).  In that

case, the mother of a mentally retarded high school student brought a § 1983 action against the

school district and various state agencies, alleging a due process violation arising out of a sexual

attack on her child by other students. Id.  The Plaintiff claimed that the Defendants, as state actors,

failed to protect her son from assault by another private actor. Id. at 731.  The Plaintiff argued that

her claim fell within the DeShaney exception because her son was "'in the care and functional

custody of the school authorities.'" Id. at 732.  The Court held that:

> [S]tate-mandated school attendance does not entail so restrictive a custodial relationship as
> to impose upon the state the same duty to protect it owes to prison inmates….or to the
> involuntarily institutionalized…..  Public school attendance does not render a child's
> guardian unable to care for the child's basic needs.  In this regard, public schools are simply
> not analogous to prisons and mental institutions.

Id. at 732 (internal citations omitted).

     In another similar case, the Third Circuit, in D.R. v. Middle Bucks Area Vocational

Technical Sch., 972 F.2d 1364 (3d Cir., 1992) (en banc), cert. denied, 506 U.S. 1079 (1993),

reached the same conclusion.  In D.R., the Plaintiffs, two female students,  alleged that while

attending art class, several male students in the class physically, verbally and sexually molested

them. Id. at 1366.  The Plaintiffs alleged that they informed the Assistant Director of the school

that these acts were taking place, but that he did not take action to correct the situation. Id.   The

Plaintiffs further alleged that other school personnel, who were named as individual Defendants,

had knowledge of some of the misconduct. Id.   The Plaintiffs alleged that despite the Defendants'

knowledge of the physical verbal and sexual abuse, they maintained a policy of laxity toward such conduct. Id at 1367.  The Plaintiffs claimed violations of their civil rights by the school and individual Defendants under § 1983. Id. at 1366.

The Plaintiffs argued that because they had to attend school under the state's compulsory attendance laws, they had a "special relationship" with the school Defendants, thus triggering a constitutional duty to protect them from the misconduct of other students. Id. at 1369.  The court compared the "restricted liberty" of students under the mandatory attendance laws with prisoners and persons who are involuntarily committed. Id. at 1371.  The court noted that "[i]nstitutionalized persons are wholly dependant upon the state for food, shelter, clothing and safety.  It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs.  Obviously, they are not free to leave." Id.  In contrast, with regard to students attending school under the compulsory attendance laws, "it is the parents who decide whether that education will take place in the home, in the public or private schools or, as here, in a vocational-technical school.... [E]ven when enrolled in public school parents retain the discretion to remove the child from classes as they see fit." Id.  The court further noted that even with a state ordinance granting teachers and principals *in loco parentis status*, "parents remain the primary caretakers" Id. at 1371.  The court held that compulsory attendance and the granting of *in loco parentis* status to school officials did not:

9

> [R]estrict the Plaintiff's freedom from meeting her basic needs…. Thus, the school Defendants' authority over [the Plaintiff] during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in <u>DeShaney</u>, particularly where their channels for outside communication were not totally closed.

<u>Id.</u> at 1372 (internal citation omitted). The court further found significant the fact that the Plaintiffs at all times resided in their homes with their parents, and therefore turn to persons unrelated to the state for help on a daily basis. <u>Id.</u> (citing <u>Ingraham v. Wright</u>, 439 U.S. 651, 670 (1977)).

Similarly, in <u>Veronia Sch. Dist. 47-J v. Acton</u>, 515 U.S. 646 (1995), the Supreme Court distinguished between the "special relationship" and acting *in loco parentis*, and even suggested that the "special relationship" does not exists in the school setting. The Court noted:

> *While we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional "duty to protect,"* we have acknowledged that for many purposes "school authorities ac[t] *in loco parentis,"*… with the power and indeed the duty to "inculcate the habits and manners of civility.

<u>Veronia</u>, 551 U.S. at 655 (emphasis added) (Citing <u>DeShaney</u>, at 200). This statement by the Supreme Court is consistent with the reasoning used by the Circuit Courts that have held that no "special relationship" exists.[3]

---

[2] <u>See</u>, <u>J.O. v. Alton Community Unit Sch. Dis. 11</u>, 909 F.2d 267, 272-73 (7th Cir. 1990) (finding that "school children are not like mental patients and prisoners such that the State has an affirmative duty to protect them."); <u>Stevenson v. Martin County Board of Education</u>, 3 Fed. Appx. 25, 2001 WL 98358 (4th Cir. 2001) ("When a student attends public school, his liberty is not restrained to the extent contemplated in DeShaney); <u>Graham v. Independent School Dist. No. I-89</u>, 22 F.3d 991 (10th Cir. 1994) (finding school not liable for constitutional deprivation for violent acts of a third party); <u>Lefall v. Dallas Independent Sch. Dist.</u>, 28 F.3d 521, 528-29 (5th Cir. 1994) (holding that the school had no affirmative duty under § 1983 to protect a student injured by another student in the school parking lot during extracurricular activity); <u>Wyke v. Polk County School Bd.</u> 129 F.3d 560, 569 (11th Cir. 1997) ("Compulsory school attendance laws alone are not a 'restraint of personal liberty' sufficient to give rise to an affirmative duty of protection."); <u>Sargi v. Kent City Bd. of Educ.</u>, 70 F.3d 907 (6th Cir. 1995) (finding "no special relationship between decedent and the school

The Second Circuit has not yet ruled on this issue.  However, the Defendants urge this court that the reasoning followed by the Third, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits should be adopted by this court.

In the present case, it is undisputed that the Plaintiff was a high school student in a public school system, still under the care of her parents.  (Compl. ¶¶ 1, 10; Bungert Depo p 5).  While in school, the Plaintiff claims she was harassed and assaulted by fellow students.  (Compl. ¶¶ 11-12, 18, 20, 22, 25; Bungert Depo pp 23, 27).  The Plaintiff claims that the Defendants failed to protect her from such conduct.

At all relevant times, the Plaintiff, as a minor living in the State of Connecticut, was obligated to attend school under the mandatory attendance laws of this state.  However, she was not compelled to attend public school.  At all times, her parents had the option of removing her from the public school and providing an alternate form of education.  In fact, the undisputed evidence shows that the Defendants twice provided a home tutor to the Plaintiff and offered her options at different alternative schools in that district. (Gura Affidavit).  Eventually, the Plaintiff's parents enrolled her in a private high school. (Compl. ¶ 39).

---

district that gave rise to a constitutional duty on the part of the Board to protect her from the consequences of a seizure while she was on the school bus"); Wright v. Lovin, 32 F.3d 538 (11th Cir. 1994); Black v. Indiana Area Sch. Dist., 985 F.2d 707 (3d Cir. 1993); Maldonado v. Josey, 975 F. 2d 727 (10th Cir. 1992) ("compulsory attendance laws do not create an affirmative duty to protect students from the private actions of third parties while they attend school."); Spivey v. Elliot, 29 F.3d 1552 (11th Cir. 1994) (finding a special relationship because the student was a residential student and could not go home at the end of the day).

Under the reasoning applied by the majority of the Circuit Courts and alluded to by the Supreme Court, the Defendants Rumia, Gura and Sylvester did not have a "special relationship" with the Plaintiff that would trigger a constitutional duty to protect her under § 1983.

2.  The undisputed facts do not support a claim for a constitutional violation under the state-created danger theory[4]

The Second Circuit has held that "a state actor may be subject to liability for an action physically undertaken by private actors in violation of the Plaintiff's liberty or property rights *if the state actor directed or aided and abetted the violation.*" Dwares v. City of New York, 985 F.2d 94, at 98 (2d Cir. 1993). The Plaintiff in Dwares, attended a flag burning demonstration, which was also attended by "skinheads", who were known to the City Police Department to have a history of racism and violent attacks. Id. While the Plaintiff was demonstrating, he was attacked and beaten by a "skinhead" in the presence of the Defendant police officers, who made no attempt to protect the Plaintiff or intervene to arrest the "skinhead". Id. The Plaintiff further alleged that prior to the attack, the Defendant police officers had conspired or agreed with the "skinheads" to allow the "skinheads" to harass and assault demonstrators, as long as the conduct did not get out of control. Id. at 97. The Plaintiff brought suit under, inter alia, § 1983, alleging that as a result of the attack

---

4 The Complaint does not allege that the Defendants created the danger that caused harm to the Plaintiff, and thus a claim under this theory is not properly asserted against the Defendants. However, without waiving the argument that such a theory of liability should not even be considered by this Court, the Defendants will address this alternate theory of liability.

by the "skinheads" and the police officers' agreement to permit such conduct, the Plaintiff's due process rights were violated.  The Second Circuit held that:

> [T]hough an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.

Id. at 99.  The court noted that the Plaintiff's allegations went well beyond allegations that the Defendants merely stood by and did nothing, but rather alleged that the police officers *actually conspired with* the private individual to permit the beating.  Id.  Thus, the court found sufficient involvement to find liability against the police officers under § 1983.  Id.

Other courts have similarly held that "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to Plaintiffs' detriments in terms of exposure to danger." D.R., 972 F.2d at 1374.  In D.R., two girls were repeatedly physically, verbally and sexually molested by other students in art class.[5]  Id.  As in the present case, the Plaintiffs alleged that the school Defendants had actual knowledge of such conduct, yet maintained a *policy of laxity* toward the conduct. Id. at 1367.  The court reviewed whether the Plaintiffs had a sufficient claim for liability under §1983 under the state-created danger theory.  The court noted that "[W]e are convinced that the school Defendants did not create Plaintiffs' peril, increase their

---

[5] The facts of D.R. are more fully discussed in part A. 1., supra.

risks of harm, or act to render them more vulnerable to the student Defendants' assaults." Id. at

1374. The court further noted that:

> The school Defendants' "acts" in assigning student teacher Peters to the graphic arts class and failing to supervise her more closely, as well as their failure to put a stop to the non-sexual pandemonium *may have created a recognizable risk that the Plaintiffs would receive little education in that class, and perhaps, physical injury* due to the roughhousing. Plaintiffs did not suffer harm, however, from that foreseeable risk.... As in DeShaney, "the most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."

Id. at 1374- 1376 (emphasis added)(citing DeShaney, 489 U.S. at 203).  The Court thus denied the

Plaintiff's claim that the Defendants *created* the danger through their inaction.  See also, Stevenson

v. Martin County Board of Education, 3 Fed. Appx. 25, 2001 WL 98358 *5 (4th Cir. 2001)

("Failing to provide protection from danger does not implicate the state in the harm caused by third

parties.")

   Similarly, in the present case, the undisputed evidence shows that Ramia, Gura and

Sylvester  did not do anything to create the danger.  In fact, the Plaintiff has failed to present any

evidence that these Defendants witnessed any harassment or knowingly permitted it to continue[6].

None of these three named Defendants were present in Mr. Decho's classroom, and the Plaintiff

concedes that Mr. Decho did not inform Gura, Ramia or Sylvester of such misconduct.  (Compl. ¶¶

---

[6] The Plaintiff alleges, without any supporting evidence, that her teacher, Mr. Decho knew of  or witnessed harassment and did not do anything to stop it, and that the bus driver also knew of or witnessed harassment but did not do anything to stop it. (Compl. ¶ 14, 24).  However, even if true, the knowledge and inactions of these individuals cannot be imputed to Defendants Gura, Ramia or Sylvester, as there is no vicarious liability under § 1983.  See Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 109 S.Ct. 2702 (1989); Johnson v Glick 481 F2d 1028 (2d cir. 1983), cert den'd 414 US 1033, 94 S. Ct 462 (personal involvement required).  Further, the Plaintiff testified that she never even met Defendants Ramia or Sylvester.  (Bungert Depo pp 99-100).

12-14). It is further undisputed that none of these named Defendants were aware of the incident that occurred at the bus stop. (Bungert Depo pp 49-50; Gura Affidavit, Ramia Affidavit).

There is no evidence to conclude that Gura, Ramia or Sylvester "directed or aided and abetted the violation" as did the police officers who agreed to permit such conduct in <u>Dwares</u>. <u>Dwares</u>, 985 F.2d at 98. In fact, the Plaintiff's testimony that Gura spoke to the three girls after she complained and that Kurt Soltis and his parents were spoken to established that Gura did more to attempt to prevent the conduct than did the defendants in <u>D.R.</u>, who merely stood by and did nothing despite their knowledge of such conduct. <u>D.R.</u>, 972 F.2d at 1374.

Similarly, with respect to the incident involving Mr. Castelot, Mr. Gura conducted an investigation into the allegations after it was brought to his attention. (Gura Affidavit). Despite his efforts, he was unable to substantiate the Plaintiff's complaints. (Gura Affidavit). However, he continued to offer assistance to the Plaintiff in the form of personal escorts in the hallway and home tutoring so that she would not be subjected to further harassment. (Gura Affidavit). Mr. Gura's response to the Plaintiff's complaints of harassment, once they were brought to his attention, cannot be construed as "creat[ing] Plaintiff['s] peril, increase[ing her] risks of harm, or act[ing] to render [her] more vulnerable to the student[s'] assaults." <u>D.R.</u>, 972 F.2d at 1374.

As the undisputed facts of this case are "insufficient to prove that the Defendants, as required under <u>DeShaney</u>, either impermissibly limited freedom of the Plaintiff[] to act on [her]

own behalf, or barred [her] access to outside support.  Nor do they demonstrate that Defendants violated a constitutional duty by creating or exacerbating the danger posed by the student Defendants", <u>D.R.</u>, 972 F.2d at 1376, there is no constitutional violation under § 1983. Accordingly, the court should grant summary judgment as to Count One of the Complaint.

> **B.**     **The undisputed facts are insufficient to maintain a cause of action under Section 1983 against the City, the Board of Education and Sylvester.**

The Plaintiff in Count Two alleges that the City of Shelton, the Shelton Board of Education and Sylvester were responsible for training and supervising the other Defendants in the performance of their duties, and that these Defendants failed to train and supervise them on policies and procedures regarding complaints of intimidation, teasing, assaults, sexual harassment and/or threats of physical harm to students.  The Plaintiff alleges that as a result of the Defendants' failure to train and supervise its employees, they deprived the Plaintiff of her rights and immunities secured by the Fifth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

In order to hold a municipality liable under § 1983 for the conduct of employees below the policymaking level, a Plaintiff 'must show that the violation of his constitutional rights resulted from a municipal custom or policy.'…  Similarly, there must be proof of such custom or policy in order to permit recovery on claims against individual municipal employees in their official capacities, since such claims are tantamount to claims against the municipality itself." <u>Dwares v.</u>

City of New York, 985 F.2d 94, 100 (2d Cir., 1993) (quoting Ricciuti v. New York City Transit Authority, 941 F.2d 199, 122 (2d Cir., 1991)) (and citing Monell v. Department of Social Services, 436 U.S. 658, 694 (1978); Hafer v. Melo, --U.S.--, 112 S.Ct. 358, 361-62 (1991)).  In addition, a municipality can be liable "for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." Amnesty America v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 387-90 (1989)).

1.    The Plaintiff's injury was not caused by any unconstitutional actions at the hands of municipal employees

The Second Circuit has held that "[d]emonstrating that the *municipality itself caused or is implicated in the constitutional violation* is the touchstone of establishing that a municipality can be held liable for the unconstitutional actions taken by municipal employees." Amnesty America, 361 F.3d at 123 (emphasis added). "An award of damages against a municipality based on the actions of its officers is not available unless the *officers' conduct amounted to a constitutional injury*." Stevenson, at * 7 (emphasis added).

In Stevenson, the Plaintiff alleged that the board of education was responsible for his injuries, caused by a third party, because it "failed to develop adequate school safety plans and failed to train teachers and administrators in proper techniques for controlling violence in school." Id. at *7.  The court did not even reach the issue of whether the failure to train amounted to a

custom or policy, nor did the court consider whether the board's failure to train the teachers and administrators amounted to deliberate indifference. Id.  The court noted that "[a]n award of damages against a municipality based on the actions of its officers is not available unless the officers' conduct amounted to a constitutional injury." Id. (citing City of Los Angeles v. Heller, 475 U.S. 769, 799 (1986) ("[N]either Monell...nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.")) (other internal citations omitted).  The Stevenson court had already determined that there was no constitutional liability on the part of the municipal employees for failing to protect the Plaintiff from physical assaults from other students. Id.  Accordingly, the court noted that since the officers' conduct did not amount to a § 1983 violation, "it follows that the school board likewise cannot be held constitutionally liable." Id.  See also, D.R., 972 F.2d at 1376 (finding municipality not liable when private actors committed the underlying violative acts.)

As in Stevenson and D.R., there can be no municipal liability under § 1983 in the present action, as there was no constitutional violation committed by municipal officers or employees. Rather, the underlying violative acts were committed by other students.  (Bungert Depo pp 23-24, 27, 38, 47-48).  It has already been established, above, that the municipal employees cannot be held liable under § 1983 for failure to protect the Plaintiff from harm or under a theory of state created

danger.  (See Section III. A. 1., Supra.).  Accordingly, there was no underlying constitutional violation for which to hold the municipality responsible.

> 2.  <u>The Plaintiff has offered no evidence that the Defendants acted with deliberate indifference</u>

Even assuming, *arguendo*, that the court does not agree with the Defendants' arguments above that the municipal employees did not commit a constitutional violation, there is still no liability on the municipality under a failure to train theory.  Under this theory of liability, a Plaintiff must offer sufficient evidence for a reasonable fact finder to conclude that the municipality's failure to train amounted to deliberate indifference. <u>Amnesty America</u>, 391 F.3d at 129 (citing <u>City of Canton</u>, 489 U.S. at 387-90; and <u>Walker v. City of New York</u>, 974 F.2d 293 (2d Cir. 1992)). Deliberate indifference "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997) (internal quotations omitted).  Such deliberate indifference can be established through proof that the city had failed to train its employees, and that the need for better training was so evident that the failure to train would amount to deliberate indifference. <u>Walker</u>, 974 F.2d at 300.

In <u>Dwares</u>, the Plaintiff alleged that the City acted with deliberately indifferent by failing to provide adequate training, monitoring and supervision of the Defendant police officers to prevent the officers from violating citizens' constitutional rights. <u>Dwares</u>, at 101.  The court noted, however, that the Plaintiff did not allege any facts other than the police officers' inaction in the

instance complained of, to suggest a custom, policy or practice of inadequate training. Id.  The court therefore held that the Plaintiff had not set forth allegations sufficient to establish liability on the municipality for a failure to train.

In the present action, the Plaintiff has failed to offer any evidence that the Defendants failed to train its employees.  The Plaintiff merely alleges, without more, that "*upon information and belief*, Defendants failed to train and supervise[7]" its employees.  After discovery, the Plaintiffs still do not have any evidence of a failure to train.  In fact, the undisputed evidence shows that the Defendants' teachers and administrators receive 18 hours of professional training each year.  (Gura Affidavit).

3. The Plaintiff has offered no evidence of inadequacies of the training program or a causal connection between such inadequacies and a constitutional deprivation

In order to successfully establish municipal liability under a failure to train theory, a Plaintiff must additionally present sufficient evidence to:

---

[7] The Second Circuit in Amnesty America also discussed a theory of failure to *supervise* its employees, holding that "Plaintiffs must establish [the Chief of Police's] deliberate indifference by showing hat 'the need for more or better supervision to protect against constitutional violations was obvious,' but that [the Chief] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct…. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." Amnesty America, 361 F.3d at 127-28 (internal citations omitted).

The Plaintiff in the present case has offered no evidence to show that any of the policymakers in the Town or on the Board were aware of a need for more or better supervision of its employees, not has the Plaintiff offered any evidence that would show that the policymakers made any conscious choice to ignore any inadequacies.  In fact, according to the Plaintiff's own testimony the school employees made efforts to remedy the Plaintiff's situation, including advising the three female students to stop  harassing the plaintiff, investigating her complaint against Mr. Castelot, offering to provide a personal escort to further protect the Plaintiff at school, meeting with the Plaintiff's guardians to further discuss the issues, offering placement in alternative schools, and providing home tutoring to accommodate the Plaintiff.  (Compl. P 17; Bungert Depo p 30, Gura Affidavit).  In addition, as with the failure to train theory, proof that a constitutional violation took place in the hands of the municipal employees is a necessary element of such a claim. See Id.  As discussed above, no constitutional deprivation occurred.

> [I]dentify a *specific deficiency* in the city's training program and establish that the deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. … Thus the Supreme Court emphasized in <u>City of Canton</u> that Plaintiffs must establish that "the officer's shortcomings…resulted from…a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances.

<u>Amnesty America</u>, 361 F.3d at 129 (quoting <u>City of Canton</u>, 489 U.S. at 391.).    In <u>Amnesty</u>, the

Plaintiffs, who had been arrested, sued the town under § 1983 alleging that police used excessive

force against them at an anti-abortion demonstration.  <u>Id.</u>  One of the theories proffered by the

Plaintiffs was that the Chief of Police failed to train the officers not to use excessive force in

making arrests, after excessive force had been demonstrated at a prior protest. <u>Id.</u> at 129.   The

Plaintiff argued that the display of excessive force at the first protest clearly demonstrated a need

for better training, and that the failure to subsequently provide such training amounted to deliberate

indifference.  <u>Id</u>.   The court found there was sufficient evidence for a reasonable factfinder to

conclude that the Chief of Police acted with deliberate indifference by failing to provide such

additional training.  <u>Id</u>.   However, the court held that the Plaintiffs  "failed to offer any evidence as

to the purported inadequacies of the program and the causal relationship between those

inadequacies and the alleged constitutional violations." <u>Id.</u>   Accordingly, the court granted the

Defendants' motion for summary judgment on the failure to train theory of liability.

Similarly, in the present case, even assuming, *arguendo*, that the Plaintiff has

offered evidence to establish the failure to train and that such failure to train amounted to

deliberate indifference, the Plaintiff has offered no evidence to establish the inadequacies of the training program, and the causal relationship between such inadequacies and the alleged constitutional violation.

The Plaintiff has failed to offer any evidence to show that there was a constitutional deprivation at the hands of a municipal employee, that the municipality failed to train or act with deliberate indifference with regard to such lack of training, and has failed to offer any evidence of any inadequacies of the training program or a causal connection between such inadequacies an a constitutional deprivation.   Accordingly, a finder of fact could not reasonably find the Defendants liable under § 1983 under a theory of a failure or supervise to train its employees.   Accordingly, summary judgment should be granted as to Count Two.

**C.    Summary Judgment Should Granted as to the Remaining Counts As the Defendants are Entitled To Governmental Immunity**

1.    The City of Shelton and Board of Education are entitled to governmental immunity.[8]

In Count Three of the Complaint, the Plaintiff alleges that Defendants City and Board of Education, through their agents, servants and employees, made numerous representations that it

---

[8] The Connecticut Supreme Court has held that "'the ultimate determination of whether qualified immunity applies is ordinarily a question of fact or law for the court…[unless] there are unresolved factual issues material to the applicability of the defense…[where the] resolution of those factual issues is properly left to the jury.'" Colon v. City of New Haven, 60 Conn. App. 178, 181 (2000), quoting Mullgan v. Rioux, 229 Conn. 716, 736 (1994), on appeal after remand, 38 Conn. App. 546 (1995).  Thus, it is an appropriate issue for a motion for summary judgment.

would provide a safe learning environment at Shelton High School where students would be safe and respected.  The Plaintiff alleges that these statements were false, and that the Defendants knew these statements to be untrue at the time they were made, thus constituting fraudulent misrepresentations. (Compl., Count Three, ¶¶ 42-45).  In Count Four, the Plaintiff alleges that the Defendants made representations that it would provide a safe learning environment and that the Defendants knew or should have known that their statements were false, thus constituting a claim for negligent misrepresentation. (Compl., Count Four, ¶¶ 42-45).  Count Five alleges that the Plaintiff's injuries were the direct and proximate result of the negligence and carelessness of the Defendants.  (Compl., Count Five, ¶ 43).   Count Nine alleges negligent infliction of emotional distress as to all Defendants.  (Compl., Count Nine, ¶¶ 42-44).  In Count Ten, the Plaintiff alleges that the Defendants City and Board of Education, through the acts of their employees, engaged in intentional infliction of emotional distress toward the Plaintiff. (Compl., Count Ten).   The City and Board of Education are entitled to governmental immunity with respect to each of these claims.

a. *The negligence claims against the City and Board of Education*

In Counts Four, Five and Nine, the Plaintiff alleges negligent misrepresentation, negligence and negligent infliction of emotional distress, all claims brought under common law negligence theories.

It is the settled law of this state that:

> A municipality is immune from liability for the performance of governmental acts as distinguished from ministerial acts. Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . On the other hand, ministerial acts are performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action.

Gauvin v. City of New Haven, 187 Conn. 180, 184, (1982) (citations omitted). The Court has also "recognized, however, that governmental immunity may be abrogated by statute…. Thus the general rule developed in our case law is that a municipality is immune from liability for [its tortuous acts] unless the legislature has enacted a statute abrogation that immunity".

Pane v. City of Danbury, 267 Conn. 669, 677, 841 A.2d 684 (2004) (citing Spears v. Garcia, 263 Conn. 22, 28, 818 A.2d 37 (2003)).

In Pane, the Plaintiff filed, inter alia, a common-law tort action for invasion of privacy against the City. Pane, 267 Conn. at 675. The Court noted that the City was entitled to governmental immunity, as "[t]he Plaintiff has not cited any statute abrogating" such immunity. Id. at 677. Similarly, in Williams v. City of New Haven, 243 Conn. 763, 707 A.2d 1251(1998), the mother of a minor child brought an action sounding in common law negligence against the City of New Haven, alleging that her child was injured when an unauthorized person opened a hydrant, which allegedly occurred due to the negligence of the City in failing to prevent such unauthorized use of the hydrant. Id. The Defendant claimed that governmental immunity "barred the Plaintiffs' negligence action against it because they did not rely on any statute granting an exception to the

governmental immunity provided by the common law to a municipality." Id. at 765.  The Court agreed, and accordingly granted summary judgment.  See also, Bazinet v. Barry, 2004 WL 615675 (Conn. Super. May 11, 2004) (copy attached) (Motion to Strike granted as Plaintiff did not allege any statutory waiver of Town's immunity); Diggs v. Town of Manchester, 303 F.Supp. 2d 163 (D.Conn. 2004) (Town entitled to governmental immunity because Plaintiff did not rely on any statute to abrogate immunity with respect to claim for negligent infliction of emotional distress against the Town).

In the present case, the Plaintiff has only alleged common-law negligence against the municipality.  The acts alleged as the basis for the various common-law negligence claims are governmental acts; ensuring safety, monitoring students' activities, ensuring discipline and supervision of students, and taking steps to enforce policies are all acts that are performed for the benefit of the public and are either supervisory or discretionary in nature.[9]  The Plaintiff has not

---

[9] Connecticut Courts have uniformly held that training and supervision are governmental functions.  For example, the Connecticut Supreme Court has stated:

> [I]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality.... [T]he failure to provide, or the inadequacy of, police protection usually does not give rise to a cause of action in tort against a city....  Considerable latitude must be allowed to [a police chief] in the deployment of his officers, or in enforcing discipline.  Indeed, because a police chief's authority to assign his officers to particular duties is deemed a matter that concerns the public safety, he may not be deprived of his power to 'exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time.'…We conclude that the general deployment of police officers is a discretionary governmental action as a matter of law."

Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 180 (1988) (citation omitted) (alterations in the original).  See also, Hughes v. City of Hartford, 96 F.Supp.2d 114, 119-20 (D. Conn. 2000)  (noting that "extensive and near-unanimous precedent in Connecticut clearly demonstrates that the acts or omissions alleged in Plaintiff's complaint – the failure to screen, hire, train, supervise, control and discipline- are discretionary acts as a matter of law.").  See also, Doe v. Board of Education, 76 Conn. App. 296 (2003) ("The Plaintiff does not dispute that the duty…of the defendant to supervise students, is a discretionary governmental duty.")

cited any statute to abrogate such immunity. As such, summary judgment should enter as to these Defendants for Counts Four, Five and Nine.

      *b.  The intentional torts against the City and the Board*

In Counts Three and Ten, the Plaintiff alleges fraudulent misrepresentation and intentional infliction of emotional distress.  The municipality similarly has governmental immunity with respect to these claims.

Connecticut General Statute §52-557n provides in pertinent part that: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property cause by:…(A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct…" Conn. Gen. Stat. § 52-557n(a)(2)(A).  The Connecticut Supreme Court has recently held that such language serves to bar claims for intentional infliction of emotional distress against a municipality. Pane v. City of Danbury, 267 Conn. 669, 685-86, 841 A.2d 684 (2004).

In Pane, the Plaintiff brought a claim against the city and the city's personnel director for, inter alia, intentional infliction of emotional distress as a result of the personnel director's unauthorized release of the Plaintiff's personal information. Id.  The Supreme Court held that the City was immune from suit under § 52-557n(a)(2)(A). Id.  The Court relied on a holding of the Connecticut District Court, in which concluded that, "[t]o the extent that [the Plaintiff] alleges that

the [t]own is liable for any intentional infliction of emotional distress by [the town employee] ... such a claim is precluded by [General Statutes] § 52-557n." <u>Pane</u>, at 685-86 (quoting <u>Miner v. Cheshire</u>, 126 F.Supp.2d 184, 186 (D.Conn. 2000) (alterations in the original).).   The <u>Pane</u> Court was "persuaded by the court's analysis in <u>Miner</u>…[and] conclude[d] that the Plaintiff's claim against the city for intentional infliction of emotional distress is barred by governmental immunity." <u>Id.</u> at 686.

In the present case, the Plaintiff has filed a claim for intentional infliction of emotional distress against the City and the Board of Education.  Under the Court's holding of <u>Pane</u>, summary judgment must enter as a matter of law as to Count Ten.

Similarly, the Plaintiff's claim for *fraudulent* misrepresentation is also insufficient as a matter of law.  In that claim, the Plaintiff has alleged that the Defendants' agents and employees knowingly made false statements to the Plaintiff to induce her to enroll in the school.  However, such a claim of "fraudulent" misrepresentation clearly falls within the statute's immunity based on "[a]cts or omissions of any employee, officer or agent which constitute…fraud…or willful misconduct." § 52-557n(a)(2)(A).  As such, the City is immune from liability with respect to this cause of action.  Accordingly, summary judgment must enter as a matter of law with respect to Count Three.

2. <u>The individual government employees are entitled to government immunity as they were engaged in discretionary acts, and the Plaintiff was not a foreseeable victim of imminent harm.</u>

In Count Seven, the Plaintiff alleges that the individual Defendants were negligent in that they failed to have an adequate system to monitor students' activities, failed to identify students who were at risk of being harmed, failed to discipline or properly supervise students who caused harm to other students, failed to provide protective services to students like the Plaintiff, and failed to mandate that the school faculty and staff follow policies and procedures or adopt policies or procedures to protect the safety of students. (Compl., Count Seven, ¶43).  In Count Nine, the Plaintiff alleges negligent infliction of emotional distress against the individual Defendants. (Compl., Count Nine, ¶43-44).

Like municipalities themselves, municipal employees also benefit from governmental immunity.  "[A] municipal employee… has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act." <u>Colon v. Board of Education</u>, 60 Conn. App. 178, 180, <u>cert. denied</u>, 255 Conn. 908 (2000) (citing <u>Fraser v. Henninger</u>, 173 Conn. 52, 60, 376 A.2d 406 (1977)).  However, unlike municipalities, [t]he immunity from liability for the performance of discretionary acts by a municipal employee is subject to three exceptions or circumstances under which liability may

attach even though the act was discretionary…" <u>Id.</u> at 180-81 (citing <u>Evon v. Andrews</u>, 211 Conn. 501, 505, 559 A.2d 1131 (1989)).

As discussed in the above section, the conduct complained of was clearly discretionary in nature[10]; they required the use of judgment on behalf of the actors. There were no prescribed set of rules governing the manner in which the acts were to be carried out. Accordingly, the individual Defendants are subject to governmental immunity unless the actions fall within one of the three exceptions.

The Connecticut Supreme Court has held that:

> There are three exceptions or circumstances under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; ... second, where a statute specifically provides for a cause of action against a municipality or a municipal officer for failure to enforce certain laws; ... and third, where the alleged acts involve malice, wantonness or intent to injure rather than negligence.

<u>Evon v. Andrews</u>, 211 Conn. 501, 505, 559 A.2d 1131 (1989); see also <u>Gordon v. Bridgeport Housing Authority</u>, 208 Conn. at 167.

The Plaintiff in this case has not cited any statute specifically providing for a cause of action against the municipality or its officers, nor do these counts allege malice, wantonness or intent to injure. Accordingly, the only exception that needs to be considered for the purposes of this motion is whether under the undisputed facts, it was apparent to the Defendant that their failure

---

[10] See footnote 9, supra.

to act would be likely to subject an identifiable person to imminent harm.  A review of the relevant case law suggests that in this case, the minor Plaintiff was not a foreseeable victim of imminent harm as intended by the exception. Specifically, in order to fall within the exception to immunity, there had to be a risk of *imminent* harm.  Such risk was not present in this case.

In Burns v. Board of Education, the Court defined the concept of imminent harm to be a condition which is limited to the duration of a *temporary dangerous condition* and *limited to the area* where the temporary dangerous condition exists. Burns, at 650; Purzycki v. Town of Fairfield, 244 Conn. 101, 110 (1998).  The Court also required that the potential for harm be significant and foreseeable. Id.

In Burns, a student sued the school for injuries as a result of a fall on a patch of ice on school grounds.  The Court noted that the risk which caused the Plaintiff's injury could not have occurred at any time in the future, but rather the danger was limited to the duration of the temporary icy condition in this particular area of the school ground.  Id. at 650.  In addition, the Court noted that at the time of the incident, "the potential for harm from a fall on ice was significant and foreseeable." Id.  As the Court had found that the Plaintiff was an identifiable victim of this imminent harm, the Defendant was not entitled to immunity.  Id.

Similarly, in Purzycki v. Town of Fairfield, 244 Conn. 101, 108 (1998), the Court also found an exception to governmental immunity.  In that case, an eight year old student was injured

when he was tripped by another student in the hallway on the way to recess.  Id.  Significant in this case was the fact that the hallway on the way to recess was not monitored.  Id.  The court, in considering the "foreseeable victim of imminent harm" exception, noted that the exception applied, namely because the foreseeable harm was limited to a specific time period (lunch period) and a limited geographical area (the hallway on the way to recess), and involved a temporary condition since every other aspect of the lunch and recess period were supervised; it was only the limited time and location in which the students went from lunch to recess that they were not supervised, and thus were foreseeable victims of imminent harm.  Id. at 110.

In contrast to Purzycki, and in a case very similar to the present case, the Plaintiff in Doe v. Board of Education, filed an action against the Board of Education, alleging that the Defendant failed to provide a safe and secure educational environment for students.  Doe v. Board of Education, 76 Conn. App. 296 (2003).  The Plaintiff alleged that as a result, she was physically and sexually assaulted by other students at school.   "Specifically, the Plaintiff allege[d] that the Defendant did not provide an adequate number of hall monitors, did not implement a system for ensuring that students were not roaming the halls unsupervised and did not take steps to provide for an adequate supervision of students known to have disciplinary problems or to secure vacant rooms so that they could not be used for unlawful purposes." Id. at 297.  The Defendant moved to strike on grounds of governmental immunity.  Id.

31

The Doe Court determined that, in contrast to <u>Pruzycki</u>, "the Plaintiffs have not alleged facts showing that the danger to students was limited in duration and geography." <u>Doe</u>, at 304. The Court found that the danger of harm "was not limited to a particular area of the school and a particular time period…. [T]he harm…potentially could have occurred any time that students traveled without permission to any unsupervised areas of the school." <u>Id.</u> at 305. The Court held the facts were insufficient to establish the necessary element of imminent harm, and accordingly, the Defendant was subject to governmental immunity from liability for its discretionary acts.

Similarly, in the present case, the Plaintiff has alleged a general failure to protect. As in <u>Doe</u>, the harm danger to the Plaintiff was not limited to a particular area of the school or a particular period of time. In fact the undisputed evidence shows that the Plaintiff complains to have been harassed in class, in the hallway, outside of school during a fire alarm, at the school bus stop, and in the school lavoratories, at different times during the school day, over the course of over five months. (Compl. ¶ 13, 20, 18, 22, 25; Bungert Depo pp 23, 27, 38, 51-52). There is no evidence of a particular threat that the Plaintiff would be harmed at a specific time in the future. Similarly, there is no evidence that only a specific location in the school was dangerous. As the danger was not limited in duration and geography, there was no imminent harm. Accordingly, the individual Defendants are immune from liability from their discretionary acts, and therefore, summary judgment should enter in their favor as to Counts Seven and Nine.

**D.     The Undisputed Facts Are Insufficient to Support the Plaintiff's Claim for Intentional Infliction of Emotional Distress Against the Individual Defendants**

In Count Ten, the Plaintiff alleges Intentional Infliction of Emotional Distress.  As discussed above, this cause of action cannot be maintained against the City and Board on the basis of governmental immunity.  As to the individual Defendants, the undisputed facts do not rise to the requisite level of extreme and outrageous conduct in order to sustain such a cause of action.

In order to prevail on a claim of intentional infliction of emotional distress, a Plaintiff must prove the following four elements:

> (1) [T]hat the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2)that the conduct was extreme and outrageous; (3) that the Defendant's conduct was the cause of the Plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe.

Petyan v. Ellis, 200 Conn. 243, 253 (1986); see also Appleton v. Board of Education, 254 Conn. 205, 210 (2000); Carrol v. Allstate Ins. Co., 262 Conn. 433, 442 (2003).

"Whether a Defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the courts to determine.  Only where reasonable minds disagree does it become an issue for the jury."  Appleton, 254 Conn. at 210 (citation omitted).  Courts have further recognized that:

> Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society…Petyan v. Ellis, supra, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12 p. 60.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

> intolerable in a civilized community.  Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!  1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).  Conduct on the part of the Defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.  <u>Mellaly v. Eastman Kodak Co.</u>, 42 Conn. Sup. 17, 19, 587 A.2d 846 (1991).

<u>Carrol</u>, 262 Conn. at 443 (quoting <u>Appleton</u>, 254 Conn. at 210-11) (internal quotation marks omitted).

In <u>Appleton</u>, the court considered a claim of intentional infliction of emotional distress by a tenured teacher who complained that her former principal:

> "[M]ade condescending comments to [her] in front of [her] fellow colleagues questioning [her] vision and ability to read," telephoned the Plaintiff's daughter, representing that the Plaintiff "had been acting differently" and should take a few days off from work; and telephoned the police, who came to the school and escorted the Plaintiff out of the building to her car. The Plaintiff also asserted…that she was subjected to two psychiatric examinations at the request of the board, and that she was forced to take a suspension and a leave of absence and, ultimately, forced to resign.

<u>Appleton</u>, 254 Conn. at 211.  The Court noted that while such conduct "may very well have been distressing and hurtful to the Plaintiff[, t]hey do not…constitute extreme and outrageous conduct within the meaning of the precedents…. " <u>Id</u>.

In a similar case, a police officer sued his former chief of police for intentional infliction of emotional distress as a result of certain conduct in connection with the denial of a promotion to

rank of lieutenant, despite his obvious qualifications for the position.[11] <u>Bombalicki v. Pastore</u>, 71

Conn. App. 835 (2002).  The Court, in affirming the directed verdict for the Defendant on the issue

of intentional infliction of emotional distress noted:

> Although the evidence revealed that Pastore did not hold the Plaintiff in high regard, spoke
> ill of him and did not want to promote him, such conduct in this case does not go "beyond
> all possible bounds of decency," cannot be regarded as "atrocious," and is not "utterly
> intolerable in a civilized community." …Although the conduct was insulting and likely to
> result in hurt feelings, such conduct is insufficient to form the basis for an action in
> intentional infliction of emotional distress.

<u>Id</u>. at 841-42 (quoting <u>Appleton</u>, 254 Conn. at 211).

Finally, in <u>Gur v. Nemeth-Martin Personnel Consulting, Inc.</u>, 2001 WL 357356, (Conn.

Super. March 20, 2001) (copy attached), the Plaintiff claimed that she suffered emotional distress

as a result of the Defendants' extreme and outrageous conduct with respect to:

> (1) The use of double entendres, work play and jokes, conversations, gestures and teasing in
> a sexual context; (2) The use of the internet to view pornography during work hours and
> within open view of all workers; (3) On June 5, 1995, a graphic verbal reference was made
> to a homosexual act and a woman's sexual act; and (4) On October 8, 1996, a sexually
> explicit word was used in the Plaintiff's presence.

<u>Id</u>. at *8.  The court found that the Defendant's conduct, while "clearly offensive to the Plaintiff

and certainly inappropriate under any circumstances" did not "rise to the level required, as a matter

of law, to establish the basis for the claim of intentional infliction of emotional distress."  <u>Id</u>.  <u>See</u>

---

[11] Evidence during trial revealed that the Plaintiff had received a rank on his civil service exam that made him eligible for the promotion, and that a newspaper article revealed that "if [chief of police] Pastore followed the test results, which he had done in the past, the Plaintiff was among those on the list of officers to be promoted." <u>Id</u>. at 840.  Evidence also revealed that Pastore and the Plaintiff did not like each other, and that Pastore's conduct included "clearly expressing his dislike of the Plaintiff, talking about the Plaintiff unfavorably to other officers, opposition to the Plaintiff's promotion and an ultimate decision not to recommend the Plaintiff for promotion." <u>Id</u>. at 841.

<u>also</u> <u>Dollard v. Board of Education</u>, 63 Conn. App. 550, 555 (2001) ("While… conduct alleged here may have been distressful and harmful to the Plaintiff, it was no more extreme and outrageous then the conduct alleged in <u>Appleton</u>.")

The facts presented in this case are in no way more extreme or outrageous as the facts alleged in  <u>Appleton</u>, <u>Bombalicki</u>, <u>Dollard</u>, or <u>Gur</u>, all of which were found to be insufficient to amount to intentional infliction of emotional distress.  The Plaintiff testified that, after experiencing harassing remarks from other students, she met with Defendant Gura to advise him of the sexual harassment, and identified the students who were responsible for the remarks.  (Compl. ¶ 16; Bungert Depo p 29).  According to the Plaintiff's testimony, Gura, in turn,  met with these students and advised them to refrain from harassing the Plaintiff.  (Compl. ¶17; Bungert Depo p 30).   A few months later, after the harassment had continued by these and other students, Defendant Gura became aware of an assault on the Plaintiff, after it was reported to him by another student. (Compl. ¶ 26; Gura Affidavit).  Gura did not have the Plaintiff evaluated by the school nurse and did not notify the Plaintiff's mother and natural guardian of the incident.  (Comp. ¶ 26).   The Plaintiff's mother subsequently took the Plaintiff to the hospital.  (Compl. ¶ 27).  The following day, the Plaintiff and her mother met with Defendant Gura about the assault and identified the student that assaulted her.  (Compl. ¶ 28; Gura Affidavit).  An investigation into the matter was conducted, but the student accused had a solid alibi.  (Gura Affidavit).

The Plaintiff was subsequently provided with homebound tutoring for the remainder of the academic year as a result of the suggestion of the Plaintiff's doctor, who requested such tutoring be provided through the end of the academic year due to post traumatic stress disorder.  (Compl. ¶ 33; Gura Affidavit; Letter of Dr. Rosmarin dated April 12, 2001).  The following academic year, the Plaintiff's doctor wrote to Defendant Sylvester urging his support to transfer the Plaintiff out of that school district as a result of continued symptoms related to her previous experience with harassment.  (Letter of Dr. Rosmarin dated August 20, 2001).  The Plaintiff was again provided with homebound tutoring from October 2001 through January 2002, but was then advised by Defendant Sylvester that they could no longer provide such services.  (Letter of Sylvester).  The Defendants offered to provide Plaintiff with escort services to ensure her safety, but Plaintiff refused.  (Bungert Depo p 92; Gura Affidavit)  Defendants also offered alternative schools within the district, but Plaintiff refused.  (Bungert Depo p 82; Gura Affidavit).  In January, 2002, the Plaintiff enrolled in Sacred Heart Academy.  (Bungert Depo pp 14-15).

The Defendants' reaction to the Plaintiff's complaints certainly does not amount to conduct that that exceeds "all possible bounds of decency" tolerated by a civilized community.  Carrol, 262 Conn. at 443.  It is not the type of conduct that would cause the average member of the community to "arouse his resentment against the actor, and lead him to exclaim, Outrageous!" 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).  While the Plaintiff may have hoped for a

different response to her complaints, the action the Defendants did take does not amount to the requisite level of extreme and outrageous conduct necessary to sustain a cause of action for intentional infliction of emotional distress.[12]

As a jury could not reasonably and legally reach any other conclusion except that she failed to prove extreme and outrageous conduct, the court should grant the Defendants' motion for summary judgment as to the Plaintiff's claim for intentional infliction of emotional distress in Count Ten.

### E.    The Evidence Does Not Support a Claims for Respondeat Superior Liability Against the City and Board

In Count Eight, the Plaintiff brings a common law claim for "Respondeat Superior" liability, alleging that the individual Defendants were acting as employees of or as agents for the City and Board. (Compl. Count VIII, ¶ 42).  The Plaintiff alleges that they acted "in concert with, for and on behalf of and at the instance and request of said Defendants City and Board and were acting within the scope of their employment by said Defendants." Id.  The Plaintiff then claims that through the acts of their employees, the Defendants City and Board have deprived Plaintiff of her rights and have caused her damages.  Id.

---

[12] Whether the sexually harassing conduct of the other students would satisfy this standard is irrelevant for the purposes of the Plaintiff's claim against the individual school employees.

As argued throughout this Motion, the Plaintiff has failed, under each theory of liability alleged, to sustain a claim of liability on the part of the individual Defendants.  If this Court grants the Defendants' Motion for Summary Judgment with respect to Counts Seven, Nine and Ten, the only allegations of liability against the individual Defendants[13], the Court must also grant summary judgment as to Count Eight, which is only predicated on the individuals' liability.  If the individual defendants are not liable, the City and Board have no vicarious liability.

**F.     The Court Has Discretion to Dismiss the Pendant State Law Claims**

The Plaintiff's claims in Counts Three through Ten[14] are state law claims.  Alternatively, if the Court grants the Defendants' Motion for Summary Judgment with respect to Counts One and Two, the only federal law claims, the Court has the discretion to dismiss the state claims as well under 28 U.S.C. §1367(c)(3). "In exercising its discretion with respect to retaining supplemental jurisdiction, the district court balances several factors 'including considerations of judicial economy, convenience, and fairness to litigants.'" Correspondent Services Corp. v. First Equities Corp. of Florida, 338 F.3d 119, 126 (2d Cir. 2003) (quoting Purgess v. Sharrock, M.D., 33 F.3d 134, 138 (2d Cir. 1994).  Thus, the Court has discretion to dismiss the remaining claims if summary judgment with respect to the Federal Claims is granted.

---

[13] While Count One also alleges liability as to the individual defendants under § 1983, it has already been determined that there is no respondeat superior liability under that section. See argument in Section B, supra.

[14] There is no Count Six in the Complaint.

## IV.    CONCLUSION

For the reasons set forth above, summary judgment should enter as to all counts of the complaint.  In the alternative, if the court grants summary judgment as to the federal claims in counts one and two, the remaining counts should be dismissed.

DEFENDANTS:
**The City of Shelton, et al**


BY_____
Melissa G. Melnick
Gordon, Muir and Foley, LLP
10 Columbus Boulevard
Hartford, CT  06106
Tel. (860) 525-5361
Federal Bar No. CT18807

## C E R T I F I C A T I O N

This is to certify that a copy of the foregoing was mailed postage prepaid to the following counsel of record on September 20, 2004:

Joseph A. Moniz, Esq.
Moniz, Cooper & McCann LLP
100 Allyn Street
Hartford, CT 06103

_____
Melissa G. Melnick

::ODMA\PCDOCS\DOCS\361412\1